2023 IL App (2d) 250217-U
No. 2-25-0217
Order filed August 13, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 25-CF-835 |
| ARCADIO VAZQUEZ MANZANO, | ) ) | Honorable Julia A. Yetter, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices McLaren and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not err in ordering defendant detained pretrial where the State proved by clear and convincing evidence that (1) the proof was evident and the presumption great that defendant committed the offenses as charged; (2) defendant's pretrial release would pose a threat to the victim and the community at large; and (3) no condition or combination of conditions would mitigate the threat posed by defendant.

¶ 2    Defendant, Arcadio Vazquez Manzano, appeals from the trial court's order denying his pretrial release pursuant to 725 ILCS 5/110-6.1 (West 2024) and its subsequent denial of his motion for relief under Illinois Supreme Court Rule 604(h)(2). Ill. S. Ct. R. 604(h)(2) (eff. April 15, 2024). For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On April 16, 2025, defendant was charged with attempted first degree murder (720 ILCS 5/8-4(a) (West 2024) & 720 ILCS 5/9-1(a)(1)) (West 2024), aggravated domestic battery (720 ILCS 5/12-3.3(a)) (West 2024), and two counts of aggravated battery (great bodily harm) (720 ILCS 5/12-3.05(a)(1)) (West 2024).

¶ 5      The State filed a petition to detain defendant and a hearing was held. People's exhibit No. 1, an Aurora Police Department synopsis, was admitted. The synopsis detailed an April 14, 2025, incident in which police were called to a residence in Aurora for a report of a person with a knife, and that the offender was still on the scene. Officers arrived on scene and located the victim, Pascual (Carlos) Campechano-Fiscal, in front of the residence with a stab wound to his chest. Officers located the suspected offender, Arcadio Vazques-Manzano (defendant) in his upstairs bedroom. The victim was immediately transferred to the hospital where medical staff identified a stab wound to the chest area, fluid around the heart, and a large laceration to the hand.

¶ 6      Sergeant S. Aguirre of the Aurora Police Department spoke with a witness, Mario Belli, the father of the victim. Belli stated that defendant arrived at the residence intoxicated, and while the victim was drinking a beer on the front porch, defendant struck the victim from behind the head. Belli then witnessed the defendant produce a six-to-seven-inch kitchen knife as he began to slash at the victim's chest.

¶ 7      On April 15, 2025, Detective Frias further interviewed Belli about the incident. Belli stated that there was a fight between defendant and victim which occurred before the stabbing. The previous fight was an exchange of punches which promptly ended. Mr. Belli stated that after the first fight, he and the victim left for the store. Upon arrival back to the residence, the victim remained outside on the porch. Then, Belli, inside the residence, observed defendant walking down

the stairs from his room with a knife concealed behind his back. Belli stated that he followed defendant outside, and defendant began to cut and stab the victim. Belli stated he heard defendant state, " I'm going to finish you" and "I'm going to kill you."

¶ 8    Aurora Police spoke with Blanca Contreras, another witness, who lives with and is in a relationship with defendant. Contreras told police that defendant and the victim did not get along well, and the victim has previously made jokes to defendant when drunk which agitated defendant. Contreras stated that she was in her room when defendant entered and was bleeding. She stated that defendant told her there had been a fight between himself and the victim. Contreras then tried to calm defendant down for roughly 20 minutes. She told the police that defendant stated, "he's going to pay for it" and left the room and went downstairs. After another 20 minutes, defendant again entered their bedroom with more injuries and was bleeding more than before. Contreras asked defendant what happened but received no response. She then proceeded downstairs where she saw the victim on the porch with an apparent stab wound, and asked who had the knife, but again, received no response.

¶ 9    The police obtained and executed a search warrant for the residence. They located a kitchen knife with a black handle in the driveway, which appeared to have blood on the blade. The police also identified what appeared to be blood in the driveway, on the front porch, the stairs leading up to defendant's room, and on the floor of defendants' room.

¶ 10   The police also conducted an interview with defendant. He stated that the victim was looking for him to "start trouble." Defendant also referred to a history of not getting along with the victim and having had previous fights. Defendant stated that the victim had kicked him causing him to fall down the stairs, a fight broke out, and then he returned upstairs to his room until the police arrived a short time later. Defendant told police there was only one fight that day, and no

weapons were involved. He could not remember how he obtained the laceration to his wrist, nor did he remember anything as to the witness statements indicating he initiated a second fight or introduced a knife to the fight.

¶ 11    The State presented defendant's prior criminal convictions for aggravated driving under the influence (DUI), DUI, and Improper Entry by Alien. On the public safety assessment report, defendant scored a two out of six on the new criminal activity scale and the same on the failure to appear scale. Mitigating conditions such as GPS or electronic home monitoring (EHM) are unsuitable because defendant and his girlfriend share a residence with the victim, and defendant posed a threat to the victim.

¶ 12    Defense counsel argued that defendant did not commit a detainable offense, nor did he pose a real and present threat to any person at this point. An order requiring defendant to refrain from alcohol, to have no contact with the victim, and to stay away from the residence could mitigate any threat posed by defendant. Defense counsel also acknowledged that defendant did not have another location to live if he was released. Defense counsel further argued that there was no reason to believe defendant would not follow court orders based on his criminal history and his compliance with law enforcement on the night of the incident.

¶ 13    The trial court granted the State's petition to detain defendant. On April 23, 2025, defendant filed a motion for relief pursuant to Rule 604(h)(7) and argued that the State failed to prove by clear and convincing evidence that (1) the proof was evident and the presumption great that defendant committed the offenses as charged; (2) defendant's pretrial release would pose a threat to the victim and the community at large; and (3) no condition or combination of conditions would mitigate the threat posed by defendant. Defense counsel further argued that defendant would

reside with a friend, has limited employment, has means of getting to and from court, and that this act could be considered an aberration.

¶ 14     On May 15, 2025, following a hearing on defendant's motion, the trial court denied the motion, ordering continued detention, finding that: (1) the State met their burden of proof establishing by clear and convincing evidence that the proof was evident or presumption great that defendant did commit both of the detainable offenses, (2) based on the extremely violent nature of the offense, and the fact that a weapon was used, defendant is a real and present threat to the safety of the victim; and (3) since a weapon was involved, the nature of the offense, the presence of alcohol, and the lapse of twenty minutes before the second altercation, that EHM or a stayaway order is insufficient to mitigate the threat to the victim's safety.

¶ 15     Defendant timely appealed. Pursuant to Illinois Supreme Court Rule 604(h)(7), defendant has elected not to file a memorandum with his notice of appeal. Accordingly, defendant's motion for relief shall serve as his argument in this appeal. See Ill. S. Ct. R. 604(h)(7) Eff. Apr. 15, 2024) ("The motion for relief will serve as the argument for the appellant on appeal. *** Issues raised in the motion for relief are before the appellate court regardless of whether the optional memorandum is filled.").

¶ 16                                II. ANALYSIS

¶ 17     Where parties to a pretrial detention hearing proceed solely by proffer, a reviewing court is not bound by the trial court's findings, and our review is *de novo*. *People v. Morgan*, 2020 IL 130626, ¶ 51. As parties here proceeded solely by proffer, and we as the reviewing court stand in the same position as the trial court, our review is accordingly *de novo*. In other words, we may "conduct [our] own independent review of the proffered evidence and evidence otherwise documentary in nature." *Id*. The purpose of this independent review is to determine whether the

evidence identified in the parties' proffers is sufficient to meet the statutory factors set forth in 725 ILCS 5/110-6.1 (West 2024).

¶ 18     Under Article 110 of the Code of Criminal Procedure of 1963 (the Code), all defendants are presumed to be entitled to pretrial release. 725 ILCS 5/110-2(a) (West 2024). Upon verified petition by the State, the trial court shall hold a hearing under 725 ILCS 5/110-6.1 of the Pretrial Fairness Act (the Act). In order to be denied pretrial release, the State must prove by clear and convincing evidence that (1) the proof is evident or the presumption great that the defendant has committed a qualifying offense; (2) the defendant poses a real and present threat to the safety of any person or persons or the community; and (3) no condition or combination of conditions can mitigate the real and present threat to the safety of any person or persons or the community. 725 ILCS 5/110-6.1(e)(1)-(3) (West 2024). The State may present evidence at the hearing by way of proffer based upon reliable information in order to meet its burden of proof. 725 ILCS 5/110-6.1 (West 2024). The statute does not include any specific language outlining specifically what type of evidence the State must put forward. *Morgan*, 2025 IL 130626, ¶ 25. Rather, the State must proffer sufficient facts to prove each element by clear and convincing evidence. *Id*.

¶ 19     As stated above, defendant's motion for relief argues that the State failed in presenting the requisite proof as to all three elements. We will begin with the first element.

¶ 20     Of defendant's charges, attempt first degree murder (720 ILCS 5/8-4(1) & 720 ILCS 5/9-1(a)(1)), and aggravated domestic battery (720 ILCS 5/12-3.3(a)) constitute qualifying offenses under the Act.

¶ 21     "A person commits the offense of attempt when, with intent to commit a specific offense, he or she does any act that constitutes a substantial step toward the commission of that offense." 720 ILCS 5/8-4(a) (West 2024). "A person who kills an individual without lawful justification

commits first degree murder if, in performing the acts which cause the death: (1) he or she either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another. (720 ILCS 5/9-1(a)(1)). "A person who, in committing a domestic battery, knowingly causes great bodily harm, or permanent disability or disfigurement commits aggravated domestic battery." (720 ILCS 5/12-3.3(a) (West 2024).

¶ 22　The State's proffer contained witness statements from both Mr. Belli and Ms. Contreras, and established that defendant, victim, Belli and Contreras all reside within the same household. Contreras, who is in a relationship with defendant, told police that she was told about a fight between the defendant and the victim. After this fight, she was with defendant for 20 minutes, in their upstairs bedroom, where he told her "He's going to pay for it." Defendant then exited the room, went downstairs, and returned 20 minutes later with additional blood and injuries to his arm. Contreras then left the room, went downstairs, and saw the victim on the front porch with an apparent knife wound. She was not told what happened when she asked defendant, nor was she able to learn who had the knife.

¶ 23　During Belli's initial interview with the police, he informed them that defendant had arrived at the residence drunk, and while the victim was drinking a beer on the porch, he was struck from behind his head by the defendant who then produced a six-to-seven inch kitchen knife and began to slash as the victim's chest. During Belli's second interview with the police, he informed them about a fight which occurred prior to the stabbing. He stated that there was a small fight that ended, at which point he and the victim left the residence. Upon returning to the residence, the victim stayed on the porch, while Belli went inside. While inside, he witnessed the defendant coming downstairs, from his room, with a knife behind his back. Defendant then proceeded to cut

and stab the victim, at which time Belli heard defendant say, "I'm going to finish you" and "I'm going to kill you."

¶ 24    The State's proffer also contained details concerning the evidence collected during the execution of a search warrant including the location of a kitchen knife with a black handle in the driveway. The knife appeared to have blood on it, along with additional blood being in the driveway, on the porch, up the stairs leading to the defendant's bedroom, and on the floor of the defendant's bedroom. The proffer further identified that the victim was sent to the hospital where medical staff reported a stab wound to his chest area, fluid around his heart, and a large laceration to this hand. The victim was placed in the ICU, intubated and sedated. Based on the evidence presented through the State's proffer, we find that the State satisfied its burden of clear and convincing evidence defendant committed the detainable offense of attempted first degree murder and aggravated domestic battery.

¶ 25    Moving to the second element, defense counsel argues that the State failed to prove that defendant poses a threat to the safety of the victim. The defense argues that the factors under 725 ILCS 5/110-6.1(g) weigh in favor of a non-dangerous finding because the weapon used was a household item, defendant is not known to have weapons and has a limited criminal history. The defense further argues that the trial court based its findings on a misunderstanding of the timeline due to inconsistent statements from Belli, that this event was an aberration, and that a stayaway order would sufficiently protect the public and the victim.

¶ 26    In making a determination of a defendant's dangerousness, a trial court may consider, among other things: (1) the nature and circumstances of any charged offense, including whether it is a crime of violence or a sex crime, or involved a weapon; (2) the defendant's characteristics and history, including any criminal history indicative of violent, abusive, or assaultive behavior, and

any psychological history indicative of a violent, abusive, or assaultive nature, and the lack of any such history; (3) the identity of the person believed to be at risk from the defendant and the nature of the threat; (4) statements by the defendant and the circumstances of such statements; (5) the age and physical condition of he defendant; (6) the age and physical condition of any victim or complaining witness; (7) the defendant's access to any weapon; (8) whether the defendant was on probation, parole, or the like at the time of the charged offense or any other arrest or offense; and (9) any other factors that have a reasonable bearing on the defendant's propensity for violent, abusive, or assaultive behavior, or the lack of such behavior. 725 ILCS 5/110-6.1(g) (West 2024).

¶ 27　Defendant is charged with multiple crimes involving violence and the use of a deadly weapon. While the record does support the defense's argument that he has a limited criminal record, the criminal charge alleged here is of an extremely violent nature. Again, while the record does support defense counsel's argument that he is not known for having weapons, the action of using an everyday household item for the purpose of murder is of grave concern. Defense counsel argues that the trial court based its finding on a misunderstanding of the timeline due to inconsistent statements made by Belli. This is unsupported by the record. While it was not until the second interview with the police where Belli stated that he and the victim had left after an initial fight, and that the stabbing occurred after their return during a second fight, this timeline is supported by the statements made by Contreras. Furthermore, Belli told the police he heard defendant state, "I'm going to finish you" and "I'm going to kill you," while Contreras stated that the defendant told her, "He's going to pay for it." Furthermore, the defendant lives in the same house as the victim and other related parties. The defendant knows their exact location, how to enter the residence, and their typical behavior and movements. While it has not been addressed by the trial court or the State, it would be remiss for this court not to point out the real and present threat now facing

Contreras. She is in a romantic relationship with defendant and has made statements to the police which undoubtedly do not cast a pleasant light on the defense's portrayal of the events. For these reasons, we find that the State proved by clear and convincing evidence that defendant's pretrial release would pose a threat to the victim and the community at large.

¶ 28    Finally, defendant contends that the State failed to prove by clear and convincing evidence that no condition or combination of conditions would mitigate the threat posed by defendant. The defense argues that his ability to reside with a friend, ability to get to and from court, current employment, a no contact order with the victim, and a stayaway order would suffice to mitigate any threat he poses.

¶ 29    Under section 110-6.1(g)(3) of the Code, an order for pretrial detention must be based on, among other things, clear and convincing evidence that "no condition or combination of conditions' of pretrial release can mitigate the real and present threat to safety posed by the defendant. *Id*. § 110-6.1(g). If the trial court finds that the State proved a valid threat to someone's safety or the community's safety, it must then determine what pretrial release conditions, "if any, will reasonably ensure the appearance of a defendant as required or the safety of an identified person or the community ***." *Id*. § 110-5(a). In making this determination, the trial court should consider: (1) the nature and circumstances of the offense charged: (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; (4) the nature and seriousness of the specific, real and present threat to any person that would be posed by the defendant's release; and (5) the risk that the defendant will obstruct or attempt to obstruct the criminal justice process. *Id*. No single factor is dispositive. *Id*.

¶ 30    As stated above, defendant lives with the victim and two of the witnesses, one of which he is in a relationship with. Statements from both witnesses indicate that a cooling off period occurred

between the two fights and that defendant made statements showing his intent to cause serious bodily harm or death to the victim. After the approximate 20 minute cooling off, defendant chose to reengage the victim with a knife and viciously attack him, leaving him hospitalized with fluid pooling around his heart. Although EHM or a stayaway order may somewhat restrict defendant's movements, the fact that a weapon was used, and the nature and circumstances of this offence, show that defendant will resort to extreme violence. Defense counsel argues that defendant would reside with a friend, however, given his relationship with Contreras we do not find this to sufficiently mitigate the danger defendant poses. Furthermore, this court is concerned with the threat posed to Contreras. Not only do we find a lack of conditions to adequately mitigate the threat posed to the victim, but this court cannot find that an additional stayaway order, or any other condition, would sufficiently mitigate the threat posed to Contreras. As such, we find that the State proved by clear and convincing evidence that no condition or combination of conditions would mitigate the threat posed by defendant.[1]

¶ 31                                    III. CONCLUSION

¶ 32    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 33    Affirmed.

---

[1] Appellate courts, sitting in *de novo* review, are in a difficult position to adequately know and understand the entire list of mitigating and aggravating conditions available to defendants. Furthermore, in our removed position, we are further restricted from knowing the administrative or financial burdens potentially placed on defendants with potential conditions, or if they can meet these administrative or financial burdens. Appellate courts are limited to relying on the proposed conditions within the record or appeal, which may fail to address all potential or reasonable conditions available to defendants. This directly restricts a true and complete *de novo* review and does a disservice to both defendants and the public.